Amirkanov Yerkyn versus, well, other names that are hard to pronounce, but I want to get clarification on the names while we're up here in the spiegel. Good afternoon, Your Honor. Just one second. Just wait until everybody gets settled. All right. So you've reserved two minutes for rebuttal. Ms. Spiegel, am I pronouncing that right? That's correct, Your Honor. And so that gives you eight minutes out of the gate. And could you just give us the pronunciation and the proper name of your client? Yerkyn Amirkanov. Amirkanov. And so it's Mr. Amirkanov. That's how we refer to him, or Mr. Yerkyn? Amirkanov. Amirkanov. Yeah, that's what I thought. So that's the harder one to do. It is. It sounds like America, actually. Okay. Well, that'll do. All right. Well, you may proceed. Thank you, Your Honors. Speak right up, Ms. Spiegel. Thank you. May it please the Court. This appeal turns on a straightforward but important question. Whether a plaintiff who was coerced under threat of harm into waiving his rights to recover a $25 million debt from a U.S. company transacted through U.S. financial institutions has suffered a domestic injury under RICO. The District Court said no, but that ruling contradicts the Supreme Court's guidance in Yegezerian v. Smagen, decided in 2023, and ignores Second Circuit precedent that recognizes the loss of U.S. property and U.S. legal rights as a domestic injury, even if the coercion or misconduct occurred abroad. It's not even clear to me that, I mean, certainly the U.S. company is not named in the documents that he signed under coercion to waive rights, right? Forte Management, I think, or whatever it's called, is not one of the companies listed in his waiver, is it? Forte is a shell. It's an alter ego. Well, that's what you say now, that's what you said in your briefs, but that wasn't really before the District Court that it was an alter ego, was it? It was. Before the District Court, it was alleged in the proposed Second Amended Complaint at paragraph 124 to 140. It discussed a scheme. Well, you generally have to do more than just sort of use the phrase. I mean, you have to allege some facts. And so, well, I don't want to interrupt you, but go ahead. The exact waiver states that Mr. Amerikanoff undertakes and guarantees that neither he nor Ex-Im Bank Kazakhstan nor third parties, including but not limited to borrower companies and payer companies, will have claims on loans and payments made for payments in favor of Lodestar Holding Limited. Here, this was an expansive money laundering scheme where the defendants tried to shield themselves by using various companies, shells, and alter egos in order to be able to shield themselves from liability as a result of their scheme. And they used a U.S. company to do it. They actually transferred $25 million to Forte Marketing, to accounts that we believe are in New York. Forte Marketing is a Delaware company that does business in New York, and they effectuated the scheme by hiding the fact that the beneficiaries were government officials, high-ranking Kazakhstan government officials. So that, because they used a lot of alter egos, there were multiple companies involved, that waiver was a catch-all intended to include every single company that they used in order to shield themselves from the scheme being discovered. So your argument is that the U.S. injury is the waiver of a right to sue Forte? Let me just ask you this, what is the domestic injury? The domestic injury is the coerced waiver of U.S. legal claims. What claim? Well, Mr. Amirkanov alleges that he was arrested, tortured, and forced to sign the waiver. And what was waived, I guess, in that, assuming all that's true? The waiver extinguished his ability to pursue the $25 million debt based on... So who would he have sued, and for what? He would have sued both... He would sue Forte Marketing for unjustified enrichment, aiding and abetting fraud, and constructive trust. But moreover, the deprivation of the right itself is the injury. But, well, I mean, the waiver was in, which took place in Kazakhstan, right? The waiver took place in Kazakhstan. And that's where the threats and the coercion took place? Yes. Yeah. And so you're saying that because the waiver involved an American company that he might have sued, that's enough for a domestic injury for a civil reco claim?  The domestic injury is the waiver itself. The deprivation of the claim itself is the injury. Well, I understand that, but, I mean, there's nothing more than that. That's it, right? Well, yeah. The injury...  So the claim against Forte would consist of what? I mean, what was before the district court to conclude that there really was a claim to be waived and a claim that could have been pursued? Well, Mr. Amirkanov, he was responsible for the debt that was incurred as a result of these money laundering transactions. He became personally responsible... The debt to the bank, right? The bank's debt. All the debts that were on the bank's books. Right. The Lodestar debts, and all the debts that were tied to the transactions that took place through Lodestar. I mean, it seems quite speculative to call that a domestic injury. What's the best support, similar case, I guess, acknowledging that that is sufficient for a reco claim? In Smaggen, the court expressly rejected a rigid geographic test, holding that the domestic injury inquiry is contextual, focused on whether the injury is grounded in the United States and impairs the plaintiff's ability to exercise legal and economic rights here. In Smaggen, the court dealt with an intangible property rights, a judgment. Here, a choice of action, a course of action that was forcibly waived, is also an intangible property right. In Smaggen, it was a judgment, but even though the form is different, the substance is the same. It's still a chosen action that was recognized in Sprint Communications. But there's more going on in Smaggen, which is easier to say than the first name in that case. But there, the defendant was in California. He took domestic actions to avoid the collection, created a U.S. shell company, hid U.S. assets, submitted a forged doctor's note, I mean, in California, in the district court there. I mean, there's all these touches to the United States, whereas here, there's really nothing except that there's sort of a dotted line of money that goes to Forte, right? There's, there was $25 million that was deposited in Forte marketing accounts illegally. Well, the $25 million goes to Lodestar, right? And it's to repay a loan that had been made by somebody else to Forte, which was used to commit a bribe. So, I mean, it's not clear what cause of action you're going to have against Forte. You might have a cause of action against Lodestar, but that wouldn't be in the United States, right? Well, the cause of action, well, because it's an alter ego, it was essentially used, it would have liability because Lodestar and Forte marketing is essentially the same company. It's just wearing a different mask. But the money that was deposited became the debt, the personal debt. It was assigned as a personal debt of Mr. Anarkanoff, and then he was forced to sign a waiver to not come after any of these companies, to not be able to recover any of these monies. So he became essentially indebted to the bank for transactions to the defendants. But the injuries not from the waiver, the injuries from the fact that the waiver was forced, that he was forced and decided something that he had no interest or reason to want to sign, isn't it? Correct. So, and where did the forcing occur? In Kazakhstan. But the injury was felt- Had it been forced to sign it in the United States, that might have been an injury in the United States. The injury occurs as a result of the coercion, correct? The injury did occur as a result of the coercion, but it is felt- It's not the injury doesn't occur because of the waiver, it's because the waiver's illegitimate as a result of the fact that it was coerced. Well, the fact that his rights were, he's not able to pursue a U.S. claim in a U.S. court against a U.S. company for debts that he was forced to assume and then forced to waive, that puts the injury in the United States. But where did the coercion occur? Where did the wrong occur? The wrong, the physical wrong occurred in Kazakhstan, but the standard in Dershmantgen isn't where the harm occurred, it's where the injury is felt. And when- Well, the injury occurred when he was coerced to sign a waiver that was, that the waiver, the reason why the waiver's illegitimate is because it was coerced. So the locus of the injury is where the coercion occurred. But the- The waiver's ethereal. The waiver's not tied to anything other than the fact that it relates to a company that might be in the United States. The injury is because the waiver was, it was executed unwillingly. He was forced to, right? He's going to go into a court someplace and say, this is no good, this is unenforceable. And the question is, where did that happen? It didn't happen in the United States, it happened in Kazakhstan. Under Arger and Nabisco and Smagin, those courts- All right. Identified the standard that it's not where the events take place, it's where the injury is felt. And even though the waiver was in Kazakhstan, the effect of it was that his legal right, his legal, his claim, his ability to bring the claim to the U.S. was extinguished. Sorry. Well, you've reserved two minutes for rebuttal, Ms. Spiegel. We'll now hear from Mr. Niehaus. Thank you, Your Honors. Is that all right? Thank you. So you're, tell me how you're dividing this out. Yes, so I represent Paul Niehaus on, of Kershaw Niehaus, on behalf of the individual defendants. That would be Mr. Klebenoff and Mr. Kahn. So the court has identified the difficulties with the domestic injury arguments. More specifically, plaintiff has Smagin exactly backwards. In Smagin, the court said that the question is where the injury arises, not where it is felt. What plaintiff is trying to do here is essentially choose the jurisdiction in which his injury is felt by taking actions that have occurred in Kazakhstan with Kazakh citizens and Kazakh entities and take them to the United States in order to take advantage of the United States' very generous laws regarding RICO, travel damages, and things like that. Had the, had plaintiff moved to France, the injury would not have occurred in France. There would not be a domestic injury in France. The fact that he waived some rights pursuant to these agreements occurred in Kazakhstan and we cannot overcome the presumption against extraterritoriality simply by saying I have or potentially had a right here. I can't quite explain what that cause of action would be against forte marketing. I can't exactly explain how I would recover. But because I chose after leaving Kazakhstan to come to the United States, I've been deprived of a right in the United States. None of the events at issue here occurred in the United States. We have one transaction that was allegedly conducted through a New York correspondent bank. As Your Honor rightly pointed out, the funds came from a third party not relevant to this. I get all that, but I'm just trying to think where the line is drawn for your, for what you just said. So in other words, if somebody puts a gun to someone's head in Kazakhstan and says I want you to sign over your interest in property and oil fields in Texas, your view is that still would not be a domestic injury that could be pursued under RICO? Not pursuant to RICO, Your Honor. There may be other causes of action that would be available to the individual, but not a RICO claim. So even if the property is here, as long as the coercion took place elsewhere, there's no domestic injury? There may be domestic injury. Then you have to go back to Snagan's contextual approach to determine whether or not the locus of the action is in fact in the United States, whether the harm arises in the United States, not whether it is felt in the United States. Well, I mean, if the whole objective was to get property in the United States and if that property could consist of a legal claim, right, your view is that that wouldn't cut it? Again, in your hypothetical, it could cut it, absolutely. The difficulty here, of course, is that none of this activity was aimed at depriving this individual. Well, I'm just trying to figure out where the line is. I think your answer is that this isn't close to that line. It's not close to that line. And in fact, if you look at the dissent in Snagan, Justice Alito, I believe it was, says, hey, the difficulty that we have here is that we've devised this contextual approach that says look at the entire context of the activity and then determine whether it arose in the United States or clearly arose in the United States. We should be drawing a brighter line. We should be adopting something more like the Seventh Circuit rule, the rule that was rejected by the majority of the court, which would be that the injury occurs at the plaintiff's place of residence. That was specifically rejected by the Supreme Court in Snagan. And that's essentially the logic that underlies the claim here that a domestic injury occurred in the United States because that's where the individual is right now. That line of logic has been rejected by the Supreme Court. We don't see that this is a close call under Snagan and there's no reason that RICO should apply to the actions that occurred in Kazakhstan a number of years ago and which have been addressed and rejected repeatedly by the Kazakh courts. If there are no further questions, I will rest on my papers with respect to the domestic injury. Thank you very much. And now we'll hear from Mr. Meehan. For the National Security Committee of Kazakhstan. Thank you, Your Honor. If I have that right. You do have that right. I am Kevin Meehan. I am representing the Defendant of LA National Security Committee of the Republic of Kazakhstan, or NSC. I'm happy to answer any questions that the panel may have. But in light of time and efficiency, I'd like to focus on an issue that is unique to my client, which is the Foreign Sovereign Immunities Act, or FSIA, which provides the sole and exclusive basis for subject matter and personal jurisdiction in civil actions against a foreign state. Here it's undisputed that my client, NSC, qualifies as a foreign state under the FSIA, and thus NSC is presumptively immune from the jurisdiction of U.S. courts. NSC has repeatedly and consistently invoked its immunity under the FSIA. By contrast, plaintiff has repeatedly evaded the issue. The FSIA is not mentioned in any of the complaints, including the proposed second amended complaint, which was filed in response, in part, to NSC's motion to dismiss under the FSIA. Plaintiff didn't raise this issue in the opening brief. It didn't raise it in the motion to amend, and thus we submit that plaintiff has foreclosed from raising any arguments on jurisdiction under the FSIA. But even if you entertain it, the theory asserted in the reply brief that the direct effect of clause of the FSIA's commercial activity exception applies is frivolous for two reasons. One, the NSC is not alleged to have engaged in any commercial conduct, much less commercial conduct that resulted in a direct effect in the United States. This case is governed by the Supreme Court's decision in Saudi Arabia v. Nelson. Nelson held that the Saudi government's arrest, detention, and interrogation of a U.S. citizen constituted an exercise of sovereign police powers and not commercial activity, and therefore couldn't support the exercise of jurisdiction under the commercial activity exception. The court was clear that even if a foreign state abuses its police powers to achieve some economic goal or acts with a profit motive, that's irrelevant to the commercial activity exception because the statute itself states that the purpose or motive of the state's actions is irrelevant to whether the activity is commercial. What matters is the nature of the activity. And here the nature of the activity in the proposed Second Amendment complaint is that the NSC arrested, questioned, and detained the plaintiff in Kazakhstan. That is quintessential police activity. The cases, we have a string cite at pages 21 to 22 of our brief. Can I interrupt you for a second?  So district court went off really on Mr. Niehaus' point but characterized it as a 12B1 dismissal. And it seems to me domestic injury is not, it's not subject matter of jurisdiction, it's just simply whether or not you've stated a claim, and so it really would be 12B6. If I'm right about that, does that mean we have to do this Foreign Sovereign Immunities Act analysis first? Or can we sort of divide and conquer and say 12B1, 12B6, there's failure to plead domestic injury, the claim is out, and so we don't need to, you'd be out anyway, we don't need to get to Foreign Sovereign Immunity. Your Honor, this court can affirm on any ground supported by the record. I take your point. Well, sometimes you have to make a jurisdictional determination first. So I guess that's really what I wanted some clarification on. I do agree with you that domestic injury, my understanding, is a merits issue. We've held that. So whether we're right or wrong, we're stuck with it. Exactly. I think it is right. It is. And you can't exercise jurisdiction over a foreign state unless there is jurisdiction under the Foreign Sovereign Immunities Act. But I believe that the law, and you can look at the Papandreou case out of the D.C. Circuit, which is directly on point on this, well, not directly on point, but on point, that if there is some easier ground to dismiss the case without getting into some thorny questions of Foreign Sovereign Immunity, you certainly can do that. My reading of the district court's opinion in which it cites this court's decision in Anatari's aircraft and quotes the holding that the direct effect exception did not apply in that case, I view that in the context of our motion to dismiss under the Foreign Sovereign Immunities Act and the arguments made by the parties in their briefs is essentially dismissing this case on Foreign Sovereign Immunity grounds. To go back, as I said, on the commercial activity point, it's covered by Nelson. None of the cases that plaintiff has cited support an alternative view. In terms of direct effect, again, as your honors have pointed out, all of the activity and all of the parties here were in Kazakhstan. Any injury that was suffered by the plaintiff was suffered in Kazakhstan. Under this court's decisions in Kensington, International, House versus Rafidian Bank, even Anatari's aircraft, the injury occurring outside of the United States means there's no direct effect in the United States. None of the cases the plaintiff has cited in this reply brief support that. They're all contract cases that deal with a breach of a contractual obligation to make payment in the United States. That's not at issue here. Your honors, I'll rest on my papers unless you have any further questions. Thank you very much. We'll now hear from Ms. Spiegel for two minutes of rebuttal. To address the FSIA argument, there's a commercial activity exception that applies in this case. The exception exists to prevent sovereigns from... I don't even know why it exists. I guess the question is, why does it apply? It applies because the NSC forced three months of torture in order to But that was commercial activity in the United States? Well, to force Mr. Amerikano to sign a commercial contract with oligarch partners. NSC's conduct included coercion of private financial contracts, destruction of private bank records, and facilitation of U.S.-based financial transfers all for the private benefit of politically connected individuals. This is commercial conduct. That would mean, basically, any dollar-denominated transactions that are enough to support the commercial exception to the Foreign Sovereign Immunities Act. That's a pretty broad exit, don't you think? Well, here, this case is similar to WMW machinery. When sovereigns are engaged in activity and exercise those powers for the same powers that can be exercised by private citizens, like entering into contracts, coercing settlements, laundering funds, obstructing lawsuits, all of that is, under Weldover, under WMW machinery, all of that is considered private conduct. This contract is basically an agreement to take responsibility for the debts of the bank and to waive any claims against third parties. Right? Yes. And you're saying that that is enough for commercial activity in the United States because, maybe, perhaps, there could be a claim brought against one of those third parties in the United States. Well, the chosen action, the cause of action, is recognized as an intangible property right. They interfere with a U.S. property right. The company is in the United States. The money was transferred to the United States. The debt, the money was... It's not clear that it was transferred to the United States. There's an allegation that it went through an American company, somehow, somewhere, but it's... You keep saying that that's enough for the RICO statute for a domestic injury. It's not clear to me how on earth that would be enough for Foreign Sovereign Immunities Act, the exception for commercial activity. Well, the government aided and abetted private citizens into entering the facilities, the prison, and to intimidate and to coerce the plaintiff to sign private agreements. That is the very definition of private conduct. The fact that it was done on government property doesn't change the fact that they interfere with a U.S. property right. But how is that commercial activity in the United States? Going into a Kazakh prison and coercing someone is commercial activity in the United States? The effect was felt in the United States because it interfered with a U.S., with a right that existed in the United States. The company is a U.S. company. It can only be sued on U.S. soil. It can't be sued in Kazakhstan if the money and the damage was done here in the United States. Alright. Well, we will reserve decision. Thank you all.